## Case No. 16,172.

### UNITED STATES v. ROBERTS.

[See In re Crittenden, Case No. 3,393.]

## Case No. 16,173.

### UNITED STATES v. ROBERTS et al.

[2 N. Y. Leg. Obs. 99.]

Circuit Court, S. D. New York.   May, 1843.

ADMIRALTY JURISDICTION—CRIMES COMMITTED IN FOREIGN HARBORS—PIRACY—REVOLT— AUTHORITY OF MATE.

1. Where prisoners were indicted for an endeavor to make a revolt on board of the Ameri-

1 [6 Am. Law Rev. 765, contains only a partial report.]

can packet ship Burgundy, lying at the port of Havre in France, in an enclosed dock into which the tide was let at the will of the owner: *Held*, that the circuit court of the United States had jurisdiction of the offence. *Held*, also, that the admiralty jurisdiction, under the act of congress passed March 3d, 1835, was co-extensive with the English admiralty courts in cases when robbery or offences were committed in creeks, harbors and ports in foreign countries, which robbery was done by American citizens, and amounted to piracy.

2. Under the act of 1825 [4 Stat. 115], passed by the American congress, the United States courts had jurisdiction over their own citizens in foreign countries for offences committed on tide waters.

3. The mates of a vessel in the absence of the master had the command of such ship or vessel, and they could direct the whole of the crew to go below from the deck of the vessel to their berths in the night time.

4. Where one of the crew came on deck apparently to see what the cause of a disturbance was that was then going on, when ordered peremptorily to go below and neglected to do so, he was guilty of disobedience of orders and might be punished under the act of congress for disobedience of orders and an endeavor to make a revolt.

Endeavor to make a revolt and mutiny.

A. Nash, for prisoners.

The District Attorney, for the United States.

BETTS, District Judge (sitting as circuit judge). The prisoners in this case were indicted under the act of congress passed March 3, 1835, § 2 [4 Stat. 775], for an endeavor to make a revolt and mutiny on board of the American packet ship Burgundy, on the high seas, where the tide ebbs and flows within the admiralty and maritime jurisdiction of the United States. The vessel was a packet ship sailing from New York to the port of Havre in France. Captain John Rockett was master. The prisoners on their arraignment pleaded not guilty and moved for separate trials, whereupon John Roberts and William Bilson were put upon their trials under one panel of the jury, and Samuel Nicholson was tried under a separate panel, but at the same term of the court. The cause against Roberts and Bilson came on for trial, and the mate of the vessel was first introduced as a witness. He testified that the vessel arrived at the port of Havre, and appeared at the quay, where the harbor master took charge of the vessel under the municipal authorities of Havre, and the vessel was then taken to her station inside of the flood gates. It appeared that the docks at Havre had been artificially constructed by the municipal authorities of the town. That the earth had been first excavated to the proper depth, and then walls had been put up on each side of the excavations, and flood gates erected so that on a flood tide the dock became full, while on an ebb tide, the flood gates prevented the water running out, and the vessels in this manner rode in the water without touching the bottom. The

Burgundy lay at a station within the dock, and inside of the flood gates, and discharged her cargo on to the quay, where were stationed several persons night and day, known in France as gens d'armes, who were employed by the French government for police services. Having discharged her cargo, she took in another cargo for the homeward voyage, and having taken in the cargo the vessel was ready to pass out of the dock through the flood gates the next morning at the flood tide. In the afternoon, a box of gold coin, containing between 5 and 6000 dollars, was brought on board as a part of the cargo for the homeward voyage, and was stowed under the lock and key of the first mate, in a stateroom adjacent to where he slept, which appeared to be a cabin under deck. This cabin communicated with the deck of the vessel by a gangway, and a house stood over the gangway which was locked at nights. It did not appear that the crew generally knew that the specie had been brought on board; indeed there was no proof on the trial that any one of the crew belonging to the vessel was cognizant of the fact that specie had been brought on board of the vessel. The mate also testified that that night the captain of the Burgundy slept on shore, and that in the night, after he had retired to his cabin, with the specie locked up in an adjacent stateroom, he heard a noise at the door of the house at the head of the companion way. That some person was trying to burst in. He sprang out of his berth, ran up to the door, and the man outside was kicking in the panels. He unlocked the door, went out, and met at the door the two prisoners and another person who had formerly belonged to the ship, but had left the vessel at Havre. The night was pretty dark. He spoke to the prisoners and ordered them into the forecastle. They did not obey his orders, and upon this state of things he sang out for the 2d and 3d mates. It appeared by this time that most of the crew had rallied on deck. He ordered them all below. They appeared to be noisy and somewhat riotous. He then clenched the men and began with his fists to clear the deck. Being a stout man, one after another was knocked down, and a general melee took place. Finally, he himself, assisted by the 2d mate, succeeded in capturing three or more of the crew, placing them on the quarter deck and tying them. The mate and his comrade then told the crew that no man should come aft upon peril of life, and ordered the crew to go to the berths at the forecastle. They neglected and refused to do so, and he and the 2d mate then took hold of some scantling strips which they found and cleared the decks. The person who was kicking at the door ran on to the quay and escaped into the town, and never was again seen by the witness. This evidence of the mate was confirmed by the 2d mate, and indeed some of the crew who were examined,

confirmed the account of breaking in the door, or attempting to do so, but stated that when they heard the noise they came on deck for the purpose of ascertaining what the difficulty was. It did not appear that all of the men were dressed who came on deck, though the prisoners were dressed if the mate testified correctly, when the attempt to break open the door was frustrated by his coming on deck amongst the assailants. Nothing distinct appeared that the two prisoners Roberts and Bilson had attempted or participated in any attempt to break open the door leading to the stateroom, where the specie was stowed. The cause was summed up to the jury, who rendered a verdict of guilty against the two prisoners Roberts and Bilson; and then the other prisoner, Samuel Nicholson, was put on trial under the indictment by another panel of jurors. The testimony in this cause was the same as in the preceding case, except Nicholson proved that he came on deck when he heard the noise at the house door. He was in his night clothes when he came on deck, without coat, vest, pantaloons or hat, and he proved that he went aft to interfere with the mates only to see what was doing, and to protect the men the mates were beating and tying on the quarter deck. The mate testified that the prisoner came aft contrary to his orders, and after he had repeatedly ordered the crew into their berths in the forecastle. The mate appeared to have acted throughout with a heroic courage, and proved himself to be physically competent, when assisted by the 2d mate, to control the whole of the crew of the vessel. The various points growing out of this trial were reserved by the prisoners' counsel with liberty to make a case and move in arrest of judgment. The counsel summed up respectively to the jury, and they retired and brought in a verdict of guilty against Nicholson, the prisoner.

The counsel for the prisoners made a case, and moved in arrest of judgment, and the

1st point was, that this court had no jurisdiction of the offence charged against the prisoners; that it was a case not within the admiralty jurisdiction of the United States, and cited U. S. v. Wiltzburgher, 5 Wheat. [18 U. S.] 76; U. S. v. McGill [Case No. 15,676], and urged that the jurisdiction of the circuit court of the United States depends exclusively on the constitution and laws of the United States and is territorial, and that this court had no jurisdiction over the present case, the offence having been committed within the enclosed dock at Havre, in the kingdom of France, while the vessel was fastened on shore to the quay. The learned counsel also cited Livingston v. Jefferson [Id. 8,411], in regard to the question of local jurisdiction, and again cited U. S. v. Hamilton [Id. 15,-290], where the prisoner was indicted for a larceny committed on board of an American ship, in an enclosed dock at the port of Havre in France, into which dock the water was ad-mitted at the will of the owners only. The court held in this case that the prisoner could not be convicted. He also stated that in the case of De Lovio v. Boit [Id. 3,776], the court had not claimed jurisdiction so extensive as that claimed in the present case, and stated that the rule appeared to be that offences against the sovereignty must be committed within its territorial jurisdiction, and likened the case to one where two persons go from England into France and fight there, and one kills the other, it is not murder in England by the common law (3 Just. p. 48); but in the present case, the court ought not to assume jurisdiction, as all parties had voluntarily gone beyond the jurisdiction of the United States.

2d point. The counsel for the prisoner urged that Nicholson had been wrongfully convicted; that he was not an aider or abettor, or accessary in regard to any offence that the other prisoners had committed, nor had he been guilty of any offence under the laws of the United States; that the question of jurisdiction arose in his case equally with that of the other two prisoners, and likened the case to one where several persons were in company together, and engaged in one common purpose, lawful or unlawful, and one of them, without the knowledge or consent of the others, commit an offence, the others will not be involved in his guilt, unless the act done was in some manner in furtherance of the common intention. Rosc. Cr. Ev. p. 167. So where soldiers were employed to arrest a man, and unlawfully broke into a house where they supposed he was concealed, but it turned out otherwise, and then some of the soldiers went to stealing. It was held that the theft was a chance opportunity of stealing after the door was broken open, whereupon some of the soldiers committed a larceny, and others though present did not. and they were held not guilty as aiders and abettors. Id.

To the first point the district attorney joined issue on the question of jurisdiction, and contended that this was a case clearly within the jurisdiction of the United States courts in admiralty, and urged that the offence had clearly been brought within the act of congress of 1825 (section 5).

To the second point, he urged that the prisoner Nicholson had disobeyed the lawful orders of the mate, who was the commanding officer on board, and for such disobedience he ought to be punished, and having been found guilty by the verdict of the jury, he should be sentenced under the indictment.

BETTS, District Judge, at a subsequent day, delivered the opinion of the court, and stated that under the crimes act of 1790 [1 Stat. 112] maritime offences, triable and punishable by the courts of the United States, were mostly limited to those committed on the high seas, and out of the jurisdiction of any particular state; that the act of 1825 en-

larged the jurisdiction of the courts in this respect. so that offences committed on board vessels belonging to citizens of the United States while lying in any port or place within the jurisdiction of any foreign state or sovereign, by any person belonging to the company of such vessels, should be cognizable and punishable by the proper circuit court of the United States, in the same way and manner, and under the same circumstances, as if committed on board of such vessels on the high seas, and without the jurisdiction of such sovereign or state, provided that if the offender shall be tried for the offence, and acquitted or convicted thereof in any competent court of a foreign state, he shall not be subject to another trial in a court of the United States. The prisoners were indicted under the act of congress passed March 3, 1835 (section 2), which declares that if the offence charged against them in this case, and upon which they have been convicted, shall be committed on the high seas, or any other waters within the admiralty and maritime jurisdiction of the United States, that the prisoner shall be punished by a fine not exceeding $1,500, or by imprisonment not exceeding five years, or by both, according to the nature and aggravation of the offence; that the admiralty jurisdiction of the United States, properly so speaking, extended to all places where the tide ebbs and flows. It has been determined in some of the ancient admiralty criminal decisions, that if persons, who were British subjects, and belonged to British vessels, committed acts of piracy in any bays, harbors, creeks and ports while out of the realm of England, they might be indicted in the English admiralty court, and punished for such offences. This law, laid down by the ancient English authorities, does not appear to have been overruled. A modern case, in effect, adopts and confirms it. "If the robbery be committed in creeks, harbors. ports, &c., in foreign countries, the court of admiralty indisputably has jurisdiction of it, and such offense is consequently piracy." Rex v. Gillott (Feb. 28, 1812; MS. case). The same acceptation of the meaning of "admiralty and maritime jurisdiction" would naturally apply to the terms when used in the constitution or laws of the United States. Without the aid of English authority, there would seem to be no reasonable ground to doubt the rightful power and competency of the government of the United States to punish its own citizens for offences committed on board American vessels on tidewaters in any part of the world. Congress, in the act of 1825, intended to exercise that power in respect to the classes of offences there specified. The vessel, in the present case, lay in an enclosed dock in the port of Havre, where she rode at full tide. The tide ebbed and flowed there. This fact is found by the verdict. It was a part of the sea. It does not appear that the prisoners have been tried, convicted or acquitted of this offence in the French tribunals. They belonged to the American vessel, composed a part of its crew, and had been found guilty of the offence charged against them; and they are accordingly subject to punishment under the act of congress. To the second point, Nicholson might not have originally entered into the offence with the other prisoners, or been guilty of disobedience of orders; and it was left to the jury to determine whether he in any manner afterwards countenanced or participated in the riot on board and disobeyed the orders of the mates, given for the maintenance of order and subordination. The jury have found him guilty, and the court is not called upon by this case, if it has the power to review the verdict upon the facts.

The question reserved for the decision of the court is whether the act of congress applies to this offence, and if it does, whether congress had power to pass such act. Upon both these points the opinion of the court was that judgment must be rendered on the verdict against the prisoners. The indictment charges no robbery or attempt to commit one, and is limited to the riotous conduct and disobedience of orders of the prisoners, and their endeavor to make a revolt.

The court affirmed the verdict. and sentenced the prisoners each to pay a fine of $50. and be imprisoned one year.